**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | | |
|---|---|---|
| _____ ) | | |
| In re: ) | | Chapter 11 |
| ) | | |
| TMST, INC. (f/k/a Thornburg ) | | |
|     Mortgage, Inc.), *et al.,*[1] ) | | Case No. 09-17787 (DWK) |
| ) | | |
|     Debtors. ) | | (Jointly Administered) |
| _____ ) | | |
| ) | | |
| TMST, INC. (f/k/a Thornburg Mortgage, ) | | |
| Inc.), ) | | |
| ) | | |
|     Plaintiff, ) | | Adv. Pro. No. _____ |
| ) | | |
|     v. ) | | |
| ) | | |
| LARRY A. GOLDSTONE, CLARENCE ) | | |
| G. SIMMONS, III, and SAF FINANCIAL, ) | | |
| INC., ) | | |
| ) | | |
|     Defendants. ) | | |

**COMPLAINT**

TMST, Inc. ("TMST"), by its attorneys, hereby brings this Complaint against

Defendants Larry A. Goldstone ("Goldstone"), Clarence G. Simmons, III ("Simmons"),

and SAF Financial, Inc. ("SAF"), and states as follows:

**<u>INTRODUCTION</u>**

1.    Plaintiff TMST is a Debtor-in-Possession in the above-referenced

bankruptcy case.  The individual Defendants in this action, Goldstone and Simmons, are

former officers and employees of TMST and, on information and belief, are currently

---

[1]  The Debtors in these Chapter 11 cases are (i) TMST, Inc. f/k/a Thornburg Mortgage, Inc., (ii) ADFITECH, Inc., (iii) TMST Acquisition Subsidiary, Inc. f/k/a Thornburg Acquisition Subsidiary, Inc., (iv) TMST Home Loans, Inc., f/k/a Thornburg Mortgage Home Loans, Inc., and (v) TMST Hedging Strategies, Inc. f/k/a Thornburg Mortgage Hedging Strategies, Inc.

shareholders, directors and officers of Defendant SAF, a corporation that was created and operated while Goldstone and Simmons were still officers of and employed by TMST.

2.     As alleged more fully below, Goldstone and Simmons were officers and employees of TMST at the time TMST entered bankruptcy.  Prior to TMST's filing for bankruptcy on May 1, 2009, Goldstone and Simmons were aware that TMST would be seeking liquidation in bankruptcy and that the liabilities claimed by TMST's creditors exceeded TMST's assets.  Goldstone and Simmons undertook to create a new entity, Defendant SAF, which would operate in the same line of business that TMST previously pursued or contemplated pursuing.  Goldstone and Simmons also undertook to structure TMST's affairs before and during bankruptcy so as to permit SAF to proceed in that line of business using TMST's business strategies, many of the personnel previously (and still, during the Chapter 11 bankruptcy) working on TMST's business, and many of the same vendors and software used by TMST, among other things.

3.     To carry out these plans, Goldstone and Simmons, to the benefit of their new enterprise, SAF, took steps that, *inter alia*, caused waste of TMST's corporate assets, caused TMST to hire and retain personnel that it otherwise would have terminated, caused TMST to be charged costs for which it received no benefit, and caused some creditors of TMST to be paid on the brink of—and in some cases on the eve of—bankruptcy, to the detriment of other creditors and to no benefit of TMST.

4.     In contravention of their duties to TMST, Goldstone and Simmons did not disclose their plans to the TMST Board, but instead engaged in misrepresentations and concealed material facts that otherwise would have enabled the TMST Board to prevent or to minimize the damage to TMST from the actions of Defendants.

5.      As a result of these actions by Defendants, Defendants were unjustly enriched while TMST and its creditors were damaged.  TMST now seeks to recover the damages incurred as a result of Defendants' actions and the benefits wrongly usurped by them.

## JURISDICTION AND VENUE

6.      TMST brings this action pursuant to, *inter alia*, §§ 323(b) and 1107(a) if Title 11 of the United States Code (the "Bankruptcy Code").

7.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157, including but not limited to subsections §§ 157(b)(2)(A), (E), (H) and (O).

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

10.      Plaintiff TMST, Inc. ("TMST") is a Maryland corporation with its corporate headquarters at 2300 North Ridgetop Road, Santa Fe, NM 87506.

11.      Defendant Larry A. Goldstone ("Goldstone") is a resident of New Mexico, who resides at 8 Santo Domingo Circle, Santa Fe, NM 87506.  Prior to September 15, 2009, Goldstone was the Chief Executive Officer and President of TMST, and a Director of TMST.

12.      Defendant Clarence G. Simmons, III ("Simmons") is a resident of New Mexico, who resides at 254 Tano Road, Santa Fe, NM 87506.  Prior to September 15, 2009, Simmons was a Senior Executive Vice President and the Chief Financial Officer of TMST.

13.    Defendant SAF Financial, Inc. ("SAF") is a Delaware corporation with its registered principal address at 2300 North Ridgetop Road, Santa Fe, NM 87506, and registered agent at CT Corporation System, 127 East Marcy, Santa Fe, NM 87501.

## FACTUAL ALLEGATIONS

### A.    General Background.

14.    Prior to the filing of these bankruptcy proceedings, TMST was engaged in business as a single-family residential mortgage lender that originated, acquired and retained investments in adjustable rate mortgage assets.  TMST's stock is publicly-traded and, until December 2008, was listed on the New York Stock Exchange.

15.    Until April 30, 2009, TMST was externally managed by Thornburg Mortgage Advisory Corporation ("TMAC") pursuant to a management services agreement.  TMAC and its employees performed virtually all of TMST's day-to-day operations, and TMST had no employees of its own.

16.    TMAC is a corporation owned and controlled by Garrett Thornburg ("Thornburg").  Until October 2, 2009, Thornburg was also Chairman of TMST's Board of Directors ("the TMST Board").  On information and belief, Goldstone and Simmons hold or held equity or profit interests in TMAC and were managing directors and authorized signatories of TMAC at least until May 2009.

17.    Prior to April 1, 2009, the management services agreement provided for TMAC to receive a base management fee of $2 million per month plus an incentive fee under certain circumstances.  Effective April 1, 2009, TMST and TMAC amended the management services agreement to eliminate all base and incentive management fees and

4

instead provide that TMST would reimburse TMAC for certain out-of-pocket operating expenses incurred during TMST's wind down.

18.    Beginning in August of 2007, the value of TMST's assets declined substantially due to disruptions in the residential mortgage-backed securities markets.  In March 2008, TMST was presented with margin calls from lenders in an amount ultimately reaching approximately $600 million, which TMST was not able to meet, allegedly resulting in defaults under at least $1.8 billion of senior secured indebtedness. In March 2008, TMST entered into a one-year override agreement with its senior secured lenders.

19.    Beginning in late 2007, TMST began to explore a new business strategy (the "Thrift Strategy"), whereby TMST would acquire or form a state-chartered thrift and convert to a thrift holding company, thus enabling TMST to access core deposits and the Federal Home Loan Bank system, and other sources of financing available only to depositary institutions.  TMST's pursuit of the Thrift Strategy accelerated after March 2008.

20.    TMST spent substantial time and resources investigating the Thrift Strategy, including but not limited to legal and other professional fees, in an amount exceeding $2 million, paid to Goodwin Procter LLP ("Goodwin Procter"), Deloitte Consulting ("Deloitte") and other firms for services related to developing and pursuing the Thrift Strategy.

21.    TMST identified Union Savings Bank, a thrift located in Albuquerque, among others, as a potential target for acquisition pursuant to the Thrift Strategy.

22.    In March 2009, the override agreement with TMST's senior secured lenders expired, TMST was not able to refinance or restructure its debt, and TMST's secured creditors repossessed or sought to repossess substantially all of its assets. On April 1, 2009, TMST announced that it intended to complete an orderly sale and liquidation of its remaining assets and discontinue its operations. TMST has been insolvent since at least April 1, 2009.

23.    On April 26, 2009, the TMST Board was approached about a waiver of TMST's corporate opportunity with respect to the Thrift Strategy, and authorization was sought for Goldstone and Simmons to pursue the Thrift Strategy separate from TMST. Although the TMST Board noted that TMST was not able to pursue the Thrift Strategy, the TMST Board declined to waive TMST's corporate opportunity.

24.    On April 30, 2009, Goldstone and Simmons, along with Amy Pell ("Pell"), and Charles Macintosh ("Macintosh"), formed SAF to pursue the Thrift Strategy. Deborah Burns ("Burns") subsequently also was given an interest in SAF. Goldstone, Simmons, Pell, Macintosh, and Burns are collectively referred to as "the SAF Owners."

25.    On May 1, 2009, TMST filed a voluntary Chapter 11 bankruptcy petition in this Court.

26.    All of the SAF Owners were officers or employees of TMST, and the SAF Owners comprised all but two members of the senior management of TMST. Goldstone and Simmons supervised and directed the other SAF Owners.

27.    In the course of pursuing SAF's business, Goldstone and Simmons used their positions with TMST to, *inter alia*, (a) use TMST's assets for the benefit of SAF

without reimbursement, (b) cause TMST to give full-time jobs or bonuses to current or potential SAF employees and/or owners in order to permit them to perform services for SAF while employed by TMST and/or to ensure their availability for SAF when needed in the future, and (c) cause TMST to pay selected vendors for the benefit of SAF and to the detriment of TMST and its creditors.

28.    Goldstone and Simmons did not disclose this course of conduct to the TMST Board, but instead made affirmative misrepresentations to and concealed facts from the TMST Board, as alleged in detail below, to conceal their actions on behalf of SAF.

**B.    Misuse of TMST Computers And Office Space.**

29.    Goldstone, Simmons, and SAF have utilized TMST's corporate assets—including *inter alia*, TMST's employees, TMST's leased office space, and TMST's computers and other property—to their benefit and to the detriment of TMST and arranged for TMST to pay or reimburse TMAC for payment of the claims of certain vendors for purposes of engaging and maintaining a business relationship with said vendors to perform work for SAF, to the detriment of TMST and its creditors.

30.    SAF used TMST's employees to perform work for SAF without compensation to TMST, as set forth more fully below.

31.    SAF had no separate office of its own, and operated out of the same office as TMST.  SAF purported to pay rent for its share of office space used jointly by TMST and SAF, but this allocation of rent does not accurately reflect the amount of space used by employees working on SAF business.

7

32.     TMST employees working on SAF matters used computers and network servers for SAF work that were referred to as "SAF computers" by the SAF Owners. Goldstone stated to TMST's current President and Treasurer that SAF had leased the "SAF computers" from TMAC.  This statement was false, TMAC never leased any computers to SAF.  On information and belief, all computers and servers used for SAF business were, in fact, paid for by TMST.

33.     Upon information and belief, the "SAF computers" were in fact either owned directly by TMST or leased by TMST from TMAC.  SAF also used TMST-owned or TMST–leased servers to store data and send and receive a large volume of e-mail messages.

34.     Goldstone and Simmons were asked to leave TMST's offices on September 11, 2009.  At this time, Goldstone and Simmons took computers and cell phones leased by TMST from TMAC and approximately 40 boxes of documents and/or other property which have never been identified.

35.     On information and belief, a substantial portion of the materials removed by Goldstone and Simmons constituted property of TMST.  Upon information and belief, some or all of the materials removed by Goldstone and Simmons are being or have been used to the benefit of SAF.  SAF, Goldstone and Simmons have refused to return this property to TMST.

C.     **Misuse of TMST Employees and/or Employment Expenses.**

36.     Using their positions at TMST and TMAC, Goldstone and Simmons manipulated TMAC and TMST's employment and staffing policies to benefit their new enterprise, SAF, at TMST's expense and to the detriment of TMST's creditors.  As set

8

forth below, beginning in April of 2009, Goldstone and Simmons arranged and modified TMAC and TMST staffing policies to preserve the availability and goodwill of a group of employees whom Goldstone and Simmons had identified as desirable employees for SAF, although there was little or no benefit to TMST from retaining all of these employees.

37.    Prior to the end of April 2009, TMST had no employees.  At the end of April 2009, however, TMAC terminated all or substantially all of its employees.

38.    In late April 2009, Goldstone identified TMST employees who would be necessary to complete the orderly liquidation and sale of TMST's remaining assets. Goldstone determined that TMST would need to hire these employees.  Because TMST was to be liquidated in bankruptcy, it was expected that the number of employees needed by TMST would diminish over time during the course of TMST's liquidation.

39.    By e-mail on the evening of April 30, 2009, Goldstone told the TMST Board that TMST would need the employees that TMST hired from TMAC, including himself and Simmons; that many of these employees—including Goldstone, Simmons, other members of senior management and certain other employees—would be retained part-time on an hourly basis; and that these part-time, hourly employees would keep timecards and that TMST would pay only for the hours that the employees spent on the TMST bankruptcy.  Goldstone and Simmons did not tell the TMST Board that SAF also planned to retain some of TMST's new part-time, hourly employees and other former TMAC employees.

40.    Around the time of TMST's bankruptcy filing, Goldstone and Simmons identified some employees as potentially providing services for SAF or for both SAF and

TMST, while others were identified as working only on TMST business. Employees who would not be working full-time on TMST business were told to record the actual hours worked for TMST or for SAF in the appropriate timekeeping system. Employees who were to work only on TMST business were expected to log 40 hours per week for TMST if they were, in fact, at TMST's offices for those hours. It was the responsibility of management, and in particular Goldstone and Simmons, to keep employees designated as working solely on TMST business occupied with work on matters related to TMST's bankruptcy.

41.    Under the initial policy set by Goldstone and Simmons in or about May 2009, while some persons might work for TMST and SAF, the hours were to be recorded separately, and the employees were to be paid by TMST only for work actually performed on behalf of TMST. Compensation for any work performed on behalf of SAF was to have been the responsibility of SAF.

42.    As TMST's bankruptcy case progressed, however, Goldstone and Simmons caused TMST to pay as full-time employees those people whom Goldstone and Simmons had identified as desirable SAF employees, even though those employees did not have 40 hours of work per week for TMST, and Goldstone and Simmons developed policies that allowed TMST employees to perform work for SAF while being paid by TMST.

43.    *Inter alia*, Goldstone and Simmons modified how time would be recorded and paid for employees who worked both on TMST and SAF business. These employees were sometimes referred to as "two-hatters." As the bankruptcy proceedings progressed, Goldstone and Simmons concluded that there was not sufficient work on TMST's behalf

to keep the "two-hatters" fully employed by TMST.  In other words, given the number of TMST employees retained by Goldstone and Simmons, there was not sufficient work on bankruptcy matters to allow all of the "two-hatters" to log 40 hours for TMST each week.

44.    Under the modified policy set by Goldstone and Simmons, a "two-hatter" was to be paid by TMST merely for being *available* to work for TMST on bankruptcy matters, even if little or no work for TMST was actually performed.  A "two-hatter" was deemed "available" to work on TMST matters so long as he or she was in the building where TMST and SAF were located.  In fact, a "two-hatter" was deemed "available" to work on TMST matters, and thereby billing time to TMST, even if that employee was in the building working on some other task, such as work for SAF.

45.    Under these new policies set in place by Goldstone and Simmons, an employee was paid by TMST for all hours, up to forty hours per week, of either actual work on bankruptcy matters or time when that employee was "in the building and available" to do bankruptcy-related work.  Thus, under this modified policy, TMST employees could be, and were, paid by TMST for hours when they were "available" (i.e., "in the building") to perform bankruptcy-related work, but were actually working for or on behalf of SAF.  Such an employee might record his or her time in SAF's time recording system, but would not be paid by SAF for the SAF-related work.  Instead, TMST would pay the employee, even though it received no benefit from the work performed for SAF by the employee.

46.    Notwithstanding the fact that many of TMST's existing employees did not have 40 hours of work per week, Goldstone and Simmons continued to hire former employees of TMAC or TMST, including those originally identified as SAF employees,

causing TMST to incur additional expenses by providing current and potential SAF employees with full-time employment until SAF was ready to begin operations.

47.     Goldstone and Simmons did not disclose to the TMST Board that TMST began to pay employees, who were originally hired on a part-time, hourly basis, on a full-time basis for being "available" and "in the building," even if they were working on SAF business.  Nor did Goldstone and Simmons inform the TMST Board that staff reductions were not proceeding as quickly as Goldstone had projected on April 30, that full-time TMST employees did not have sufficient work for TMST to keep them busy, or that employees working only on SAF business were now being paid by TMST.

48.     In fact, in early July 2009, Goldstone told the TMST Board that the additional employees were necessary to complete an orderly sale and liquidation of TMST's remaining assets.  This representation was false.

49.     Since Goldstone and Simmons were asked to resign, TMST has reduced its payroll by approximately 50%, primarily by eliminating employees that spent time working on SAF matters.  It is currently estimated that the amount of wages paid by TMST for employees recording their time to SAF business exceeds $200,000.

50.     Goldstone and Simmons took other steps to benefit themselves and SAF at the expense of TMST and its creditors by preserving the availability and goodwill of TMST employees for use in pursuing the Thrift Strategy, including the following:

        a.     Simmons authorized discretionary pay raises for certain TMAC employees immediately before TMST filed for bankruptcy protection, and Goldstone and Simmons then caused TMST to pay these employees based on the higher rates.

    b.      TMAC terminated one employee, Jeffrey Heller, on April 3, 2009 and Goldstone and Simmons caused TMAC to pay a $62,500 severance payment, equal to six months' salary, which was reimbursed by TMST on Simmons' authority.

    c.      On April 3, 2009, Goldstone caused TMAC to pay a total of $93,000 in bonuses to Burns and Pell (two of the SAF Owners).  These bonuses had not been approved by Thornburg on behalf of TMAC or by the TMST Board or the TMST Board's compensation committee.  On April 15, 2009, Simmons authorized TMST to reimburse TMAC for these bonuses and attendant payroll taxes, in a total amount of $96,746.

    d.      Goldstone and Simmons similarly authorized TMAC to pay Macintosh (another SAF Owner) a $270,000 bonus on April 30, 2009, which was reimbursed by TMST upon Simmons' authorization that same day.  This payment was purportedly made pursuant to a TMAC employment contract.  The agreement, however, provided only for a bonus to be paid in December 2009, eight months later, and it explicitly stated that Macintosh's employment with TMAC was "at will."  Macintosh had no entitlement to a $270,000 bonus at that time, TMST had no obligation to pay for it, and TMST had no business reason to pay for it.

**D.     Self-Dealing By Goldstone and Simmons With Respect To Their Own Compensation.**

51.    Goldstone and Simmons sought to give themselves an even greater benefit at TMST's expense.  In late March or early April 2009, Goldstone approached the TMST Board seeking a raise and/or a bonus, which the TMST Board refused to approve.

Despite this refusal, on April 3, Goldstone caused TMAC to pay a total of $232,000 to himself and Simmons as bonuses, without authorization from Thornburg on behalf of TMAC, from the TMST Board, or from the TMST Board's compensation committee. Simmons caused TMST to reimburse TMAC for these bonuses and attendant payroll taxes.

52.     In July 2009, Goldstone and Simmons negotiated post-petition pay packages with TMST based upon their total compensation from TMAC, including bonus, during the 90 days prior to the filing of TMST's bankruptcy petition.  Goldstone and Simmons included the unauthorized bonuses in their calculation of their pre-petition rates of compensation, resulting in higher post-petition salaries for Goldstone and Simmons and increased payroll expense for TMST post-petition.

53.     During the negotiation of these pay packages, Goldstone and Simmons told the TMST Board that they were engaged full-time in the sale and liquidation of TMST's remaining assets.  On information and belief, these representations were false and Goldstone and Simmons spent much of their time working on SAF business or otherwise out of the office, and did not have 40 hours of work per week for TMST.

54.     On information and belief, Simmons further obtained unauthorized compensation from TMST by obtaining reimbursement for excessive personal expenses. For example, on multiple occasions, Simmons traveled to the northeast for business-related purposes.  Rather than stay at his final destination, Simmons chose to stay in New York City with his wife, who maintained an apartment there.  Simmons then billed TMST $500 per night, the estimated cost of a New York City hotel room (which was

never used), plus the costs of travel between New York City and his final destination. TMST continues to investigate such expenses.

### E.    Vendor Payments Charged To TMST For The Benefit Of SAF.

55.    Immediately prior to TMST's bankruptcy filing, Goldstone and Simmons authorized payments by TMST, by TMST subsidiaries, or by TMAC with reimbursement by TMST, to certain vendors with whom SAF conducted, proposed to conduct, or intended to conduct business, where TMST had no business reason to make such payments on the eve of its bankruptcy filing.

56.    These vendor payments include, *inter alia*, payments made to Goodwin Procter, Big Tree, Inc. ("Big Tree"), SS&C Technologies, Inc. ("SS&C"), Ketchum, Intex Solutions, Inc. ("Intex"), Bloomberg L.P. ("Bloomberg"), and The Carlisle Group/CAS ("CAS").

57.    These vendors either provided services that were not necessary for TMST after its bankruptcy filing, or that were only used in limited amounts by TMST.  There was no business reason for TMST to make such payments to these vendors, while not making payments to other vendors with similar unsecured claims in bankruptcy, except to preserve the goodwill of those certain vendors for the benefit of SAF.  In addition, upon information and belief, some of the services paid for by TMST, such as Bloomberg and Intex services, were used by SAF with no compensation to TMST.

58.    In late 2007, TMST engaged Goodwin Procter to explore strategic options for obtaining alternative financing, including establishing a thrift, acquiring a state bank and/or acquiring a national bank.  The Thrift Strategy was developed in the course of this work.  In 2007 and 2008, TMAC paid invoices from Goodwin Procter to TMST and recorded the payments as receivables from TMST.  TMST did not reimburse TMAC for

these expenses at that time. In 2009, TMST began paying Goodwin Procter's bills directly.

59.     Goldstone and Simmons caused TMST to settle all outstanding bills with Goodwin Procter and to pay Goodwin Procter a retainer of $650,000. Goodwin Procter subsequently returned approximately $597,000 of the retainer, after applying its pre-petition bills to TMST.

60.     On the eve of TMST's bankruptcy, TMST had no business reason to pay the bills of Goodwin Procter, as opposed to paying claims by any other creditor. On information and belief, Goldstone and Simmons caused TMST to pay all outstanding bills of Goodwin Procter because, had these bills not been paid, Goodwin Procter would not have continued to work on the Thrift Strategy for SAF.

61.     Goodwin Procter subsequently entered into an engagement letter with SAF dated June 9, 2009, and SAF paid Goodwin Procter $186,389.02 for legal services performed during April and May 2009. Thus, the same firm that had performed substantial research on the Thrift Strategy for TMST was engaged by SAF to continue that same work on behalf of SAF as soon as TMST became unable to pursue the Thrift Strategy. SAF pursued the Thrift Strategy with the same target (Union Savings Bank, Albuquerque) that TMST identified, using TMST/Goodwin Procter work product for which TMST received no consideration.

62.     TMST had spent substantial resources to develop the Thrift Strategy, as Defendants were aware. For example, in mid-March 2009, when TMST's bankruptcy was imminent, Goldstone and Simmons caused TMST to reimburse TMAC

approximately $854,000 for bills from Goodwin Procter, Deloitte Consulting and others that TMAC had paid on TMST's behalf in the development of the Thrift Strategy.

63.     In addition, on information and belief, work product owned by TMST, and generated by Goodwin Procter, relating to the Thrift Strategy was removed from TMST's computer servers at some point after TMST's bankruptcy filing.  On information and belief, this work product has been used by SAF to pursue the Thrift Strategy.

64.     Big Tree provides a software system, called "Mortgage Cadence," that was used before TMST's bankruptcy by TMST Home Loans, Inc., f/k/a Thornburg Mortgage Home Loans, Inc. ("TMHL").  TMHL is a Delaware corporation and a wholly-owned subsidiary of TMST.  Goldstone and Simmons were also directors and officers of TMHL.   Pre-bankruptcy, TMHL utilized Mortgage Cadence in connection with origination of mortgage loans.  TMHL had no further need for this system by March 31, 2009, and it had no plans to originate mortgage loans after that date.

65.     On March 31, 2009, Goldstone and Simmons authorized a payment by TMHL of $382,000 for annual licensing and support fees to Big Tree Inc. fbo Mortgage Cadence.  Just before TMST's bankruptcy filing, Goldstone and Simmons authorized TMHL to pay an additional $100,000, covering all outstanding obligations to this vendor through April 30.  The March 31 payment was made against the advice of certain officers of TMST, other than Goldstone and Simmons.

66.     TMST and its subsidiary, TMHL, received no benefit from these payments for Mortgage Cadence.  The purpose of Goldstone and Simmons in authorizing these payments was to ensure the availability of the Mortgage Cadence software for SAF.

SAF's investor presentation materials indicate that it was considering using Mortgage Cadence in its loan origination operations.

67.    SS&C is a consulting firm that licensed the CAMRA software system for trading, managing and accounting for mortgage-backed securities portfolios.  After TMST's lenders foreclosed on all of its mortgage-backed securities, TMST had no further need for this system.  Despite this fact, Goldstone and Simmons caused TMAC to make a series of payments to SS&C totaling $126,000, and caused TMST to reimburse those payments.  These payments were made just prior to TMST's bankruptcy filing, and brought SS&C current on payment.

68.    In addition, Simmons negotiated a $500,000 contract termination payment with SS&C, which TMAC paid on April 30, 2009, and Goldstone and Simmons caused TMST to reimburse TMAC for this amount the same day.

69.    TMST received no benefit from these payments to SS&C.  On information and belief, the purpose of Goldstone and Simmons in authorizing these payments to SS&C was to ensure the availability of the CAMRA system to SAF.  SAF's investor presentation materials indicate that SAF planned to use certain CAMRA software systems.  In one April 27, 2009 e-mail, SS&C's representative specifically assured Simmons that "SS&C will ensure that you are in a position to start using the same tools when your business is reinstated."

70.    Ketchum served as TMST's investor and public relations agency for a number of years.  Historically Ketchum received a flat quarterly fee/retainer basis, at $150,000 per quarter, and billed out-of-pocket expenses separately.  As an entity entering bankruptcy liquidation, TMST had no further need for such services.

71.     In March 2009, TMST paid Ketchum a $165,000 retainer prior to filing bankruptcy.   After TMST's bankruptcy filing, TMST was advised by Protiviti, its financial adviser in bankruptcy, to seek return of the retainer because no investor relations or public relations work was needed.   On or around July 1, Pell (one of the SAF Owners) informed representatives of Protiviti that the return of the unused retainer had been requested.   Protiviti has not been able to verify that any such payment was ever received, and, upon information and belief, the Ketchum retainer was never repaid.

72.     Upon information and belief, TMST did not receive $165,000 in value in exchange for the Ketchum retainer.   Upon information and belief, Ketchum has performed work for SAF and has attended SAF meetings, and some or all of Ketchum's work for SAF has been paid by TMST.

73.     Intex is a software system for modeling pricing on mortgage related securities and portfolios. TMST has continued to operate under monthly agreements with Intex even though TMST has limited use for such services.   Goldstone and Simmons represented that the system was required to evaluate counterparty claims.

74.     Bloomberg is a leading information product supplier for trading and market activities.   TMST has continued to operate under monthly licenses with Bloomberg to perform certain daily functions related to pricing of pledged asset loans and certain bankruptcy tasks such as pricing former portfolios for purposes of counterparty claim evaluation.   Upon information and belief, the level of expense and number of licenses exceed those required by TMST in the performance of its bankruptcy liquidation business.

75.     CAS is a portfolio management system used by TMST before its bankruptcy filing.  Upon information and belief, Intex, Bloomberg, CAS and other vendors were all intended to provide key SAF portfolio management systems, and TMST's post-bankruptcy expenses of maintaining Intex, Bloomberg, CAS and various other systems/services were incurred, in whole or in part, in order to further the business of SAF and not that of TMST.

76.     TMST continues to investigate the vendor payments authorized by Goldstone and Simmons, and upon information and belief other payments may exist for vendor services that were not needed by TMST but were used or intended for use by SAF.

**F.     Misrepresentations and Nondisclosures.**

77.     Goldstone and Simmons made misrepresentations to TMST, the TMST Board, and/or others acting on behalf of TMST.  In addition, Goldstone and Simmons have failed to provide full disclosure and complete information to TMST, the TMST Board, and/or others acting on behalf of TMST, when Goldstone and Simmons had a duty to do so.

78.     Such misrepresentations and nondisclosures by Goldstone and Simmons include, but are not limited to:

a.     Numerous misrepresentations and failures to provide full disclosure have been set forth above in this Complaint, and are hereby incorporated.

b.     Goldstone and Simmons misrepresented and/or failed to disclose the use of TMST computers by SAF and the lack of reimbursement to TMST for such use.

     c.     Goldstone and Simmons misrepresented to the TMST Board and others the level of staffing needed to liquidate and sell TMST's remaining assets.

     d.     Goldstone and Simmons failed to disclose to the TMST Board that staff reductions were not being implemented as planned.

     e.     Goldstone and Simmons misrepresented to the TMST Board that TMST employees were being paid for time spent performing work for SAF and that TMST employees would be paid for time spent when they were not needed to perform work for TMST.  For example, in April 2009, Goldstone told the TMST Board that TMST would pay part-time hourly employees only for the hours spent working on TMST's bankruptcy.

     f.     Goldstone and Simmons failed to disclose to the TMST Board that SAF intended to employ certain TMST employees who were being paid by TMST for up to 40 hours of work, but who in fact worked far fewer hours on TMST business.

     g.     Goldstone and Simmons failed timely to disclose to the TMST Board that full-time TMST employees were being paid for time spent performing work for SAF.

     h.     Goldstone and Simmons misrepresented their work on behalf of SAF, their work for TMST, and failed to disclose the full facts regarding how much time they were spending on SAF matters at TMST's expense.

     i.     Goldstone and Simmons misrepresented and failed to disclose the true facts relating to SAF and its operations.  For example, in August and September 2009, Goldstone informed the TMST Board that SAF had filed

preliminary materials with the OTS seeking approval of an acquisition of Union Savings Bank some time before Memorial Day of 2009 and falsely informed the Board that since then SAF had been "dormant" while waiting for regulatory approval. This representation was false, and SAF was far from "dormant" as Goldstone had represented.

79. The TMST Board reasonably relied upon each of the representations set forth above, and reasonably relied upon Goldstone and Simmons—who collectively filled the roles of President, Chief Executive Officer, Senior Executive Vice President, Chief Financial Officer, and a Director of TMST—to provide full and accurate information regarding the conduct of TMST's business.

80. Had the TMST Board been apprised of the true facts of each and any of the matters set forth above, the TMST Board would have taken steps to remove Goldstone and Simmons, to prevent the ongoing unnecessary costs to TMST, and to prevent and/or ameliorate the other losses to TMST resulting from Defendants' actions.

### COUNT I
### Breach of Duty of Loyalty

81. Paragraphs 1 through 80 are hereby incorporated as if set forth fully herein.

82. As officers of TMST, Goldstone and Simmons owed TMST a duty of loyalty, including *inter alia* an obligation to refrain from self-dealing at TMST's expense and an obligation to provide candid disclosure of matters relating to their employment, which includes but is not limited to information that Goldstone and Simmons knew or reasonably should have known would reasonably affect the judgment of the TMST Board.

83.    Goldstone and Simmons breached their duties of loyalty and to refrain from self-dealing by conducting the operations of TMST to benefit themselves and SAF at the expense of TMST and its creditors, as set forth above.

84.    Goldstone and Simmons breached their duties of loyalty and to provide candid disclosure by making misrepresentations to the TMST Board and failing to disclose facts they had an obligation to disclose, as set forth above.

85.    TMST has been damaged as a result of these breaches by Goldstone and Simmons, including but not limited to (i) costs of unnecessary or unauthorized payments to vendors, employees, and others; (ii) costs arising from office space, computers, equipment, employees and other assets used by SAF; (iii) costs arising from steps taken to preserve the availability, loyalty, and goodwill of employees for SAF; (iv) depriving TMST of the value of the Thrift Strategy and/or using the Thrift Strategy and related work product with no compensation to TMST; (v) costs of investigating and uncovering the misuse of corporate assets and other breaches by Goldstone and Simmons; (vi) costs arising from the diminution in the value of TMST's assets arising from delays in TMST's orderly liquidation as a result of Defendants' actions and the investigation of Defendants' actions; and (vii) costs, including attorneys fees, arising from the need to oppose and/or correct actions by Defendants to benefit certain creditors at the expense of others, including costs and fees incurred in recovering improper pre-petition payments made at the direction of Goldstone and Simmons to certain select unsecured creditors.

WHEREFORE, Plaintiff respectfully asks the Court to enter judgment against Defendants Goldstone and Simmons, *inter alia*, in the amount of the damages suffered by Plaintiff and appropriate interest.

23

## COUNT II
**Corporate Waste**

86.    Paragraphs 1 through 85 are hereby incorporated as if set forth fully herein.

87.    Goldstone and Simmons have wasted, used, dissipated, and/or exchanged corporate assets of TMST for little or no consideration to TMST, including but not limited to:

a.    causing TMST to pay for office space, computers and equipment used by Defendant SAF;

b.    allowing Defendant SAF to utilize TMST's Thrift Strategy, and TMST's work product in developing the Thrift Strategy, without compensation;

c.    causing TMST to make or pay for unnecessary or unauthorized bonus payments, severance payments, expense reimbursements and salary increases to Defendants Goldstone and Simmons, SAF employees and employees whom Defendants wanted to remain available to SAF;

d.    causing TMST to hire and pay employees who were not needed to liquidate and sell TMST's remaining assets, in order to ensure that such employees would remain available to SAF or loyal to Goldstone and Simmons; and

e.    causing TMST to make or reimburse TMAC for payments to vendors that did not provide goods or services that were necessary to liquidate and sell TMST's remaining assets.

88.    TMST has been damaged as a result of the actions and waste by Goldstone and Simmons, including but not limited to (i) costs of unnecessary or unauthorized

payments to vendors, employees, and others; (ii) costs arising from office space, computers, equipment, employees and other assets used by SAF; (iii) costs arising from steps taken to preserve the availability, loyalty, and goodwill of employees for SAF; (iv) depriving TMST of the value of the Thrift Strategy and/or using the Thrift Strategy and related work product with no compensation to TMST; (v) costs of investigating and uncovering the misuse of corporate assets and other breaches by Goldstone and Simmons; (vi) costs arising from the diminution in the value of TMST's assets arising from delays in TMST's orderly liquidation as a result of Defendants' actions and the investigation of Defendants' actions; and (vii) costs, including attorneys fees, arising from the need to oppose and/or correct actions by Defendants to benefit certain creditors at the expense of others, including costs and fees incurred in recovering improper pre-petition payments made at the direction of Goldstone and Simmons to certain select unsecured creditors.

WHEREFORE, Plaintiff respectfully asks the Court to enter judgment against the Defendants, *inter alia*, in the amount of the value of the corporate property wasted by Defendants, the damages resulting from said corporate waste, appropriate interest, and other appropriate relief.

## COUNT III
### Unjust Enrichment/Constructive Trust

89.    Paragraphs 1 through 88 are hereby incorporated as if set forth fully herein.

90.    Defendants have been unjustly enriched as a result of their use of property belonging to TMST for the benefit of SAF, Goldstone and Simmons.

91.     Defendants knew or should have been aware that SAF and/or Goldstone and Simmons would be unjustly enriched by their conduct. Indeed, Defendants intended that SAF, Goldstone and Simmons would be so enriched.

92.     Defendants have unjustly retained the benefits that they have received under circumstances which make it inequitable for them to do so. The Court should impose a constructive trust and require Defendants to disgorge the unjustly retained benefits.

93.     TMST has incurred damages as a result of Defendants' use of TMST's property, including but not limited to (i) costs of unnecessary or unauthorized payments to vendors, employees, and others; (ii) costs arising from office space, computers, equipment, employees and other assets used by SAF; (iii) costs arising from steps taken to preserve the availability, loyalty, and goodwill of employees for SAF; (iv) depriving TMST of the value of the Thrift Strategy and/or using the Thrift Strategy and related work product with no compensation to TMST; (v) costs of investigating and uncovering the misuse of corporate assets and other breaches by Goldstone and Simmons; (vi) costs arising from the diminution in the value of TMST's assets arising from delays in TMST's orderly liquidation as a result of Defendants' actions and the investigation of Defendants' actions; and (vii) costs, including attorneys fees, arising from the need to oppose and/or correct actions by Defendants to benefit certain creditors at the expense of others, including costs and fees incurred in recovering improper pre-petition payments made at the direction of Goldstone and Simmons to certain select unsecured creditors.

94.     TMST is entitled to recover the benefits received by the Defendants as a result of Defendants' unjust use of TMST's property and/or restitutionary damages.

WHEREFORE, Plaintiff respectfully asks the Court to impose a constructive trust and to enter judgment against the Defendants, *inter alia*, in the amount of the unjust enrichment received by Defendants, the damages and costs resulting to Plaintiff from said unjust enrichment, appropriate interest, and other appropriate relief.

<u>COUNT IV</u>
**Violation of Md. Code Ann., Corps & Assocs. § 2-405.1**

95.    Paragraphs 1 through 94 are hereby incorporated as if set forth fully herein.

96.    As a director of TMST, Defendant Goldstone was required to comply with the duties imposed upon him under Maryland law.

97.    Section 2-405.1 of the Maryland Corporations and Associations Article provides that "[a] director shall perform his duties as a director . . . (1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances."

98.    Defendant Goldstone's actions, as set forth above, in benefitting SAF at the expense of TMST, in benefitting himself at the expense of TMST, in making misrepresentations to TMST and the TMST Board, and in failing to provide full disclosure to the TMST Board breached Goldstone's duties under § 2-405.1 of the Maryland Corporations and Associations Article.

99.    As shown in the facts set forth above, Goldstone's actions were intentional and were not made in good faith and Goldstone could not reasonably have believed that his actions were in the best interests of TMST.

100.    As set forth above, TMST has been damaged as a result of Goldstone's actions in breach of his duties under § 2-405.1, including but not limited to (i) costs of unnecessary or unauthorized payments to vendors, employees, and others; (ii) costs arising from office space, computers, equipment, employees and other assets used by SAF; (iii) costs arising from steps taken to preserve the availability, loyalty, and goodwill of employees for SAF; (iv) depriving TMST of the value of the Thrift Strategy and/or using the Thrift Strategy and related work product with no compensation to TMST; (v) costs of investigating and uncovering the misuse of corporate assets and other breaches by Goldstone and Simmons; (vi) costs arising from the diminution in the value of TMST's assets arising from delays in TMST's orderly liquidation as a result of Defendants' actions and the investigation of Defendants' actions; and (vii) costs, including attorneys fees, arising from the need to oppose and/or correct actions by Defendants to benefit certain creditors at the expense of others, including costs and fees incurred in recovering improper pre-petition payments made at the direction of Goldstone and Simmons to certain select unsecured creditors.

WHEREFORE, Plaintiff respectfully asks the Court to enter judgment against Goldstone, *inter alia*, in the amount of the damages suffered by Plaintiff, appropriate interest, and other appropriate relief.

## COUNT V
## Civil Conspiracy

101.    Paragraphs 1 through 100 are hereby incorporated as if set forth fully herein.

102.    Each of the acts, alleged above, by Goldstone and Simmons were undertaken pursuant to an agreement between the Defendants that Goldstone and

Simmons would perform their duties to TMST in such a manner as to benefit SAF at the expense of TMST and/or TMST's creditors.

103.    Goldstone, Simmons and SAF have undertaken acts in furtherance of this conspiracy.

104.    As set forth above, TMST was injured as a result of the Defendants' conspiracy, including but not limited to (i) costs of unnecessary or unauthorized payments to vendors, employees, and others; (ii) costs arising from office space, computers, equipment, employees and other assets used by SAF; (iii) costs arising from steps taken to preserve the availability, loyalty, and goodwill of employees for SAF; (iv) depriving TMST of the value of the Thrift Strategy and/or using the Thrift Strategy and related work product with no compensation to TMST; (v) costs of investigating and uncovering the misuse of corporate assets and other breaches by Goldstone and Simmons; (vi) costs arising from the diminution in the value of TMST's assets arising from delays in TMST's orderly liquidation as a result of Defendants' actions and the investigation of Defendants' actions; and (vii) costs, including attorneys fees, arising from the need to oppose and/or correct actions by Defendants to benefit certain creditors at the expense of others, including costs and fees incurred in recovering improper pre-petition payments made at the direction of Goldstone and Simmons to certain select unsecured creditors.

WHEREFORE, Plaintiff respectfully asks the Court to enter judgment against the Defendants, *inter alia*, in the amount of the damages suffered by Plaintiff, appropriate interest, and other appropriate relief.

**COUNT VI**
**Turnover Pursuant to Section 542 of the Bankruptcy Code**

105.    Paragraphs 1 through 104 are hereby incorporated as if set forth fully herein.

106.    Under section 542 of the Bankruptcy Code, TMST may compel any entity not acting as its custodian that is in possession, custody or control of property of TMST to deliver to TMST any such property and to account for such property or the value for such property.

107.    Defendants should be required to turnover and deliver to TMST all property belonging to TMST in Defendants' possession, including that property referenced in paragraphs 34 and 35, plus applicable interest, costs, and fees.

WHEREFORE, Plaintiff respectfully asks the Court to order that Defendants turnover and deliver to TMST all property belonging to TMST, and to award applicable interest, costs, and fees.

**COUNT VII**
**Avoidance of Constructive Fraudulent Transfers and/or**
**Conveyances Pursuant to Section 544 of the Bankruptcy**
**Code and Applicable State Fraudulent Transfer or**
**Conveyance Law**

108.    Paragraphs 1 through 107 are hereby incorporated as if set forth fully herein.

109.    As used herein, the "Transfers" refer to the bonuses referred to in paragraph 51 and all subsequent payments made to or for the benefit of Goldstone and Simmons, including all salary and bonus payments thereafter received by Goldstone and/or Simmons.

110.    The Transfers constitute transfers of interests of TMST in property.

30

111.    TMST did not receive a reasonably equivalent value, fair consideration, or fair equivalent in exchange for the Transfers.

112.    At the time of these transfers, TMST was insolvent, knew that the value of its liabilities exceeded the value of its assets and knew that it had debts beyond its ability to pay as they became due.

113.    Goldstone and Simmons did not take or receive the Transfers in good faith.

114.    Pursuant to section 544 of the Bankruptcy Code, TMST has the rights of an existing unsecured creditor, and the Transfers are avoidable under applicable state fraudulent transfer or conveyance law by an unsecured creditor of TMST.

115.    By reason of the foregoing, pursuant to section 544 of the Bankruptcy Code and applicable state law, the Transfers should be avoided as constructive fraudulent transfers and/or conveyances such that TMST may recover from Goldstone and Simmons the value of the Transfers, plus interest from the transfer dates, and costs and fees to the extent available.

WHEREFORE, Plaintiff respectfully asks the Court to avoid and set aside all Transfers to Goldstone and Simmons, and award such other relief as may be appropriate with respect thereto.

### Count VIII
### Recovery of Constructive Fraudulent Transfers and/or Conveyances
### Pursuant to Section 550 of the Bankruptcy Code

116.    Paragraphs 1 through 115 are hereby incorporated as if set forth fully herein.

117.    The Transfers are voidable as constructive fraudulent transfers and/or conveyances pursuant to section 544 of the Bankruptcy Code and applicable state law. Accordingly, pursuant to section 550(a) of the Bankruptcy Code, TMST may recover from Goldstone and Simmons the value of the Transfers, plus interest from the transfer dates, and costs and fees to the extent available.

WHEREFORE, Plaintiff respectfully asks the Court to enter judgment against Goldstone and Simmons in the amount of the value of the Transfers, plus interest from the transfer date, and costs and fees to the extent available.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth herein, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against each of the Defendants, and:

(i)    Impose a constructive trust and/or award Plaintiff the value of the property wasted, misappropriated, converted, or otherwise taken or lost, in an amount to be proven at trial; and

(ii)    Award Plaintiff its damages, as alleged above, in an amount to be proven at trial; and

(iii)    Order the Defendants to turnover property and return property to the Plaintiff, as alleged above; and

(iv)    Order that constructive fraudulent transfers and/or conveyances to the Defendants, as alleged above, be avoided and set aside and award Plaintiff the value of such transfers; and

(iii)    Award Plaintiff pre and post-judgment interest; and

(iv)    Award Plaintiff its just costs and expenses, and reasonable attorneys fees; and

(v)    Grant Plaintiff such other and further relief as the Court deems just and proper.

Dated: October 6, 2009                Respectfully submitted,


    /s/  Randolph Stuart Sergent
Randolph Stuart Sergent (Federal Bar No. 23970)
Richard L. Wasserman (Federal Bar No. 02784)
David E. Rice (Federal Bar No. 04942)
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, MD 21202
Tel:    410-244-7400
Fax:    410-244-7742
rssergent@venable.com
rlwasserman@venable.com
derice@venable.com

*Attorneys for Debtors and Debtors in Possession*